Michael L. Baum, Esq. (SBN: 119511)
mbaum@wisnerbaum.com
R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@wisnerbaum.com
Harrison E. James, Esq. (SBN: 337733)
hjames@wisnerbaum.com
**WISNER BAUM, LLP**
11111 Santa Monica Blvd, Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

Christopher L. Coffin (*pro hac vice*)
ccoffin@pbclawfirm.com
**PENDLEY, BAUDIN & COFFIN, LLP**
1100 Poydras Street, Suite 2505
New Orleans, LA 70163
Telephone: (504) 355-0086
Facsimile: (504) 355-0089

*Class Counsel and Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

PAINTERS AND ALLIED TRADES DISTRICT COUNCIL 82 HEALTH CARE FUND, a third-party healthcare payor fund, ANNIE M. SNYDER, a California consumer, RICKEY D. ROSE, a Missouri consumer, JOHN CARDARELLI, a New Jersey consumer, MARLYON K. BUCKNER, a Florida consumer, and SYLVIE BIGORD, a Massachusetts consumer, on behalf of themselves and ALL others similarly situated,

Plaintiffs,

vs.

TAKEDA PHARMACEUTICAL COMPANY LIMITED, a Japanese corporation; TAKEDA PHARMACEUTICALS USA, Inc., an Illinois corporation (fka TAKEDA PHARMACEUTICALS NORTH AMERICA, Inc.); and ELI LILLY & COMPANY, an Indiana corporation,

Defendants.

Case No.: 2:17-cv-07223-JWH (ASx)

Hon. John W. Holcomb

Hon. Alka Sagar

**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING THE INDIRECT PURCHASER "RULE"**

Date: December 16, 2025
Time: 10:00 am PT
Location: Courtroom 9D

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ....... 2

TABLE OF AUTHORITIES ....... 3

INTRODUCTION ....... 7

BACKGROUND ....... 8

LEGAL STANDARD ....... 9

ARGUMENT ....... 9

I. The Indirect Purchaser Rule Is a Judge-Made Artifact of Antitrust Law Based on a Pragmatic Belief that Direct Purchasers Are Best Suited to Bring Antitrust Claims for Supercompetitive Pricing ....... 10

II. The Defendants' Reason for Grafting the Antitrust Indirect Purchaser Rule onto RICO Does Not Hold Water; the Supreme Court Has Repeatedly Resisted Applying Atextual Antitrust Rules to RICO ....... 12

III. The Indirect Purchaser Rule, to the Extent It Could Be Construed to Apply to RICO, Is Subsumed by the Ninth Circuit's RICO Statutory Standing Test ....... 17

IV. Pursuant to the Ninth Circuit's RICO Standing Test, the Ninth Circuit Has Already Held that Plaintiffs Have RICO Standing, and that Plaintiffs Were Directly Injured by Defendants' RICO Conduct ....... 21

V. Blind Application of the Indirect Purchaser Rule, Untethered to RICO Standing or Proximate Causation, Makes No Sense and Defies Supreme Court Precedent ....... 25

CONCLUSION ....... 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen Bradley Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers*, 325 U.S. 797 (1945) .......... 15

*Apple Inc. v. Pepper*, 587 U.S. 273 (2019) .......... *passim*

*Assoc. Gen'l Contractors v. Calif. State Council of Carpenters,* 459 U.S. 519 (1983) .......... 18

*Biederman v. FCA US, LLC*, 25-3854 (9th Cir) .......... 16

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) .......... *passim*

*Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008) .......... 18

*Carter v. Berger*, 777 F.2d 1173 (7th Cir. 1985) .......... 25

*Fenner v. Gen. Motors, LLC*, 113 F.4th 585 (6th Cir. 2024) .......... 25, 28, 29

*Glob. Master Int'l Grp., Inc. v. Esmond Nat., Inc.*, 76 F.4th 1266 (9th Cir. 2023) .......... 18

*GolTV, Inc. v. Fox Sports Latin Am., Ltd.*, No. 16-24431-CIV, 2018 WL 1393790 (S.D. Fla. Jan. 26, 2018) .......... 19, 26

*H.J. Inc. v. Nw Bell Tel. Co.*, 492 U.S. 229 (1989) .......... 16

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968) .......... 9, 10, 11, 19, 21

*Harris Cnty., Texas v. Eli Lilly & Co.*, No. CV H-19-4994, 2020 WL 5803483 (S.D. Tex. Sept. 29, 2020) .......... 25

*Hereford v. City of Hemet*,
791 F. Supp. 3d 1126 (C.D. Cal. 2025) ........................................................8

*Holmes v. Sec. Inv. Prot. Corp.*,
503 U.S. 258 (1992)........................................................................*passim*

*Humana, Inc. v. Biogen, Inc.*,
666 F. Supp. 3d 135 (D. Mass. 2023) ..................................................22, 28

*Humana, Inc. v. Indivior Inc.*,
No. CV 20-4602, 2021 WL 3101593 (E.D. Pa. July 22, 2021)................................25

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)........................................................................*passim*

*In re Actos(Pioglitazone) Prods. Liab. Litig.*,
No. 6:11-MD-2299, 2014 WL 5461859 (W.D. La. Oct. 27, 2014)............................6

*In re Insulin Pricing Litig.*,
No. 3:17-CV-0699-BRM-LHG, 2019 WL 643709 (D.N.J. Feb. 15, 2019).............25

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
546 F. Supp. 3d 1216 (S.D. Fl. 2021)......................................................27

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
336 F. Supp. 3d 1256 (D. Kan. 2018)..........................................19, 24, 26

*J & M Turner, Inc. v. Applied Bolting Tech. Prods., Inc.*,
No. CIV. A. 95-2179, 1997 WL 83766 (E.D. Pa. Feb. 19, 1997)................13, 19, 27

*Kousisis v. United States*,
605 U.S. 114 (2025)....................................................................12, 16

*McCarthy v. Recordex Serv., Inc.*,
80 F.3d 842 (3d Cir. 1996)..................................................................25

*Med. Marijuana, Inc. v. Horn*,
604 U.S. 593 (2025)..........................................................8, 14, 17, 22

*Mendoza v. Zirkle Fruit Co.*,
301 F.3d 1163 (9th Cir. 2002) ..........................................9, 18, 19, 20, 24

*Morissette v. United States*,
342 U.S. 246 (1952)..........................................................................12

*MSP Recovery Claims, Series LLC v. Amgen Inc. ("Amgen I")*, No. 2:23-CV-03130-MEMF-PD, 2024 WL 3464410, (C.D.Cal. July 15, 2024) .......... 19, 25, 26

*MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*, No. 21-21317-CIV, 2022 WL 3155035 (S.D. Fla. July 21, 2022) .......... 27

*MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91 (4th Cir. 2025) .......... 29

*Neder v. United States*, 527 U.S. 1 (1999) .......... 12

*Newton v. Tyson Foods, Inc.*, 207 F.3d 444 (8th Cir. 2000) .......... 25

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm.*, ("*Pa*inters II"), 520 F. Supp. 3d 1258 (C.D. Cal. 2021) .......... 8

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm.*, 674 F. Supp. 3d 799 (C.D. Cal. 2023) .......... 8, 21

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm.*, No. 23-55742, 2025 WL 1683472 (9th Cir. June 16, 2025) .......... 8

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm.*, ("Painters I"), 943 F.3d 1243 (9th Cir. 2019) .......... *passim*

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms.*, 796 F. App'x 919 (9th Cir. 2019) .......... 7

*RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325 (2016) .......... 14

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) .......... 8, 9, 12, 13, 14

*Sekhar v. United States*, 570 U.S. 729 (2013) .......... 12, 14, 15

*Sperber v. Boesky*, 849 F.2d 60 (2d Cir. 1988) .......... 25

*Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602 (6th Cir. 2004) ....................19, 25

*United States v. Turkette*, 452 U.S. 576 (1981) ....................17

*Yegiazaryan v. Smagin*, 599 U.S. 533 (2023) ....................9, 15

*Yousefzadeh v. Johnson & Johnson Consumer, Inc.*, 24-3296 (2d Cir. 2022) ....................16

**Statutes**

15 U.S.C. § 15 ....................12

18 U.S.C. § 1961 ....................15

18 U.S.C. § 1964 ....................*passim*

**Other Authorities**

Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527 (1947) ....................12

Organized Crime Control Act, Pub. L. No. 91-452 ....................15

S. Rep. No. 698 (1914) ....................15

## INTRODUCTION

Before tackling Defendants' latest gambit to evade liability, it is important to take stock of what this case involves. Takeda Pharmaceuticals ("Takeda") and Eli Lilly & Company ("Lilly") sold greater quantities of Actos by fraudulently concealing a bladder cancer risk. As the Multidistrict Litigation ("MDL") Court explained:

> The evidence supports that from the beginning of their commercial alliance, ***Takeda and Lilly were aware of the possibility that Actos® posed an increased risk of bladder cancer***. …Takeda and Lilly chose to move forward and acted to avoid full disclosure of that and other relevant information to the FDA; to refuse to include adequate warnings on the label, or to otherwise provide adequate warnings to physicians; to carefully avoid creating or acknowledging any evidence that might draw attention to the bladder cancer risk… ***In selling Actos® to millions of people throughout the world without providing adequate warnings of the increased risk of bladder cancer, Takeda and Lilly deprived physicians of the information necessary to perform their function in our medical care system and in so doing effectively wrote off an identifiable and significant, and perhaps, the most vulnerable segment of the population of diabetics*** … and ***consistently disregarded, denied, obfuscated and concealed that risk.*** …
>
> Takeda and Lilly engaged in grievously reprehensible behavior, with their knowing and deliberate efforts to avoid providing adequate information and warnings to prescribing doctors and unsuspecting patients, and their willingness to allow those particularly vulnerable patients to, therefore, run a higher risk of bladder cancer and death, with no advance warning, ***all in the blind pursuit of profit***.

*In re Actos (Pioglitazone) Prods. Liab. Litig.*, No. 6:11-MD-2299, 2014 WL 5461859, at *24–27 (W.D. La. Oct. 27, 2014) (emphasis added).[1]

By fraudulently concealing the bladder cancer risk, Takeda and Lilly violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") and caused the Plaintiff consumers and the Class of third-party payers ("TPPs") to spend billions on Actos prescriptions they otherwise would have never paid. In other words, Takeda and Lilly knowingly exposed millions of Americans to a carcinogen without their consent, and bilked consumers and TPPs out of billions along the way. This is the exact type of fraudulent racketeering that RICO was designed to thwart. While the racketeers here

[1] This is why a unanimous federal jury awarded $9 billion in punitive damages against Takeda and Lilly. It is also why Takeda and Lilly paid over $2.4 billion to settle personal injury claims with those diabetics who used Actos and developed bladder cancer.

were not wearing fedoras and breaking legs, they nonetheless used deception to extort money from honest consumers and TPPs while putting the safety of people at risk.

Now, eleven years into the lawsuit, Defendants seek, yet again, to completely avoid liability for their reprehensible conduct. They do this by ignoring binding Ninth Circuit law and invoking a fifty-year-old "indirect purchaser rule" ("IPR") borrowed from antitrust law. This antitrust IPR limits antitrust lawsuits to the first person that buys a product at supercompetitive prices. But, the Ninth Circuit holds that, to the extent the IPR applies to RICO claims—which, as the Supreme Court warns cannot be cabined by any bright-line rules—it should be analyzed by the flexible RICO standing test, derived from Supreme Court precedent. And, *in this case*, the Ninth Circuit already held that Plaintiffs meet that test and have RICO standing. Accordingly, Defendants' gambit fails, and the Motion should be denied.

## BACKGROUND

This case was originally filed on July 23, 2014, in the Western District of Louisiana as part of the then-ongoing multidistrict litigation proceeding, *In re: Actos (Pioglitazone) Products Liability Litigation*, MDL No. 2299. ECF # 1. Shortly thereafter, Defendants reached a global personal injury settlement for $2.4 billion, and the case was stayed for three years. In 2017, the MDL court decided to end the MDL, at which point this case was transferred, by agreement, to this Court. ECF # 56.

Plaintiffs' RICO claims were dismissed with prejudice in February 2018, because the district court did not believe that Plaintiffs could allege proximate causation under RICO. ECF # 140 at 1. However, the Ninth Circuit reversed, and held that Plaintiffs had RICO standing. *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd. ("Painters I")*, 943 F.3d 1243, 1260 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 86 (2020); *see also Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 796 F. App'x 919 (9th Cir. 2019) (ruling on other standing issues related to the appeal). Remarkably, even though the fifty-year-old IPR is based on proximate causation, *Apple Inc. v. Pepper*, 587 U.S. 273,

289 (2019) (Gorsuch, J., dissenting), Takeda and Lilly never raised the IPR on appeal. Upon remand, this case was transferred to this Court. ECF # 184. Following substantial briefing and oral argument, Defendants' second motion to dismiss was denied. *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd. ("Painters II")*, 520 F. Supp. 3d 1258, 1263 (C.D. Cal. 2021). Again, Defendants never raised the IPR.

Following a year of discovery, Plaintiffs moved to certify a TPP class and a class of California consumers. Ultimately, the Court granted Plaintiffs' motion in part, certifying a national TPP class and appointing undersigned as Class Counsel. *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 674 F. Supp. 3d 799, 842 (C.D. Cal. 2023); ECF # 326. Defendants, in turn, sought an interlocutory appeal pursuant to Rule 23(f), which the Ninth Circuit granted. ECF # 353. On appeal, the Ninth Circuit affirmed this Court's class certification order. *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, No. 23-55742, 2025 WL 1683472, at *1 (9th Cir. June 16, 2025); ECF # 370.

Defendants now move for summary judgment arguing, for the first time, that the IPR in antitrust law bars Plaintiffs' RICO claims. Although there is no discovery directly addressing who Plaintiffs paid money to when they paid for Actos prescriptions—discovery on the distribution chain of Actos has never been conducted —Defendants maintain that Plaintiffs did not directly pay money to Takeda and Lilly and, thus, cannot bring a RICO claim.

## LEGAL STANDARD

The Court is familiar with the legal standard governing summary judgment. *See, e.g.*, *Hereford v. City of Hemet*, 791 F. Supp. 3d 1126, 1138–39 (C.D. Cal. 2025).

## ARGUMENT

"[C]ivil RICO has undeniably evolved 'into something quite different from the original conception of its enactors.'" *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 613 (2025) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 500 (1985)). Whereas

RICO was originally used as a tool to prosecute "archetypal, intimidating mobster[s]," it has evolved to be "a tool for everyday fraud cases brought against "respected and legitimate 'enterprises.'" *Sedima*, 473 U.S. at 500. Fundamentally, because of its potential breath and application in a myriad of different contexts, the Supreme Court has repeatedly warned that while "a bright-line rule would no doubt be easier to apply" when it comes to fashioning RICO's guardrails, "fealty to the [RICO] statute's focus requires a more nuanced approach." *Yegiazaryan v. Smagin*, 599 U.S. 533, 545 (2023); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008) (RICO is "generally not amenable to bright-line rules."). It is against this clear admonition that this Court confronts the Defendants' latest gambit to escape liability for fraudulently concealing Actos' bladder cancer risk for over a decade.

As discussed herein, the IPR, to extent it applies to RICO, is subsumed by the flexible RICO standing test, as held in *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168–69 (9th Cir. 2002). And, previously, the Ninth Circuit has applied that test to Plaintiffs' claims and held that Plaintiffs were the most directly injured by Defendants' RICO conduct and, thus, have RICO standing. Defendants' Motion fails.

## I. The Indirect Purchaser Rule Is a Judge-Made Artifact of Antitrust Law Based on a Pragmatic Belief that Direct Purchasers Are Best Suited to Bring Antitrust Claims for Supercompetitive Pricing

To understand the IPR in antitrust cases, "it helps to start with the case that paved the way for that decision: *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968)." *Apple*, 587 U.S. at 289 (Gorsuch, J., dissenting). In *Hanover*, a shoemaker (Hanover) brought an antitrust claim against a company that supplied shoemaking machinery (United), alleging that it "monopolized the shoe machinery industry" and forced shoemakers to lease the machines at supercompetitive prices. *Hanover*, 392 U.S. at 483–84. United argued, however, that Hanover was not harmed because any "illegal overcharge … was reflected in the price charged for shoes sold by Hanover to its customers[.]" *Id.*

The Supreme Court rejected this argument for three reasons. First, drawing on

"ancient rules of proximate causation," *Apple*, 587 U.S. at 288 (Gorsuch, J., dissenting), the Court reasoned that Hanover was directly harmed regardless of whatever overcharge may have been passed on to its customers: "[a]s long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows." *Hanover*, 392 U.S. at 489. Second, the Court held that allowing this "passing-on" defense would create "insuperable difficulty" and "insurmountable" challenges because it would be impossible to reconstruct what portion, if any, of an overcharge would have been passed on to the customers absent the anticompetitive conduct. *Id.* at 492–94. Finally, the Court raised a policy concern—if the pass-on defense were allowed, it would impose the same restriction on other parties in the supply chain; companies who bought from companies like Hanover "would also have to meet the challenge that they passed on the higher price to their customers." *Id.* at 494. This means that the ultimate consumers, should they bring a case, "would have only a tiny stake in a lawsuit and little interest in attempting a class action." *Id.* at 494. "In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them." *Id.* The Court, thus, rejected any pass-on defense in antitrust cases.

The pass-on defense was next addressed in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977). "With *Hanover Shoe* having held that an antitrust defendant could not rely on a pass-on theory to avoid damages, *Illinois Brick* addressed whether an antitrust plaintiff could rely on a pass-on theory to recover damages." *Apple*, 587 U.S. at 290 (Gorsuch, J., dissenting). In *Illinois Brick*, a brickmaker engaged in price-fixing of concrete blocks sold in Chicago. 431 U.S. at 726–27. Masonry contractors paid higher prices for the concrete blocks and, in turn, passed that overcharge to general contractors working for the State of Illinois. *Id.* "The only way in which the antitrust violation alleged could have injured" Illinois "is if all or part of the overcharge was passed on by the masonry and general contractors to" the State, "rather than being absorbed at the first two levels of distribution." *Id.* at 727. The Supreme Court, thus,

examined whether an end consumer could allege an injury based on the theory that an intermediary passed-on an otherwise illegal overcharge. *Id.*

The Court tackled this issue in "two steps." *Id.* at 728. First, the Court held that "whatever rule is to be adopted regarding pass-on in antitrust damages actions, it must apply equally to plaintiffs and defendants." *Id.* The Court reasoned that "allowing offensive but not defensive use of pass-on would create a serious risk of multiple liability for defendants" because the direct and the indirect purchasers would each have a claim against the same defendant arising out of the same harm. *Id.* at 730–31. Second, if the rule is to be applied equally, the Court needed to decide "whether to cut back or abandon" the approach taken *in Hanover* or keep it. *Id.* at 736. The Court "[chose] the latter[.]" *Id.* The Court reiterated its concerns over "the burdens that" allowing a pass-on theory "would impose on the effective enforcement of the antitrust laws." *Id.* at 741. The Court raised concern about how various parties would be included in an antitrust suit if pass-on theories were permitted. *Id.* at 470. The Court also raised concerns about how damages would be calculated and apportioned. *Id.* at 471–74. And, as a policy, the Court held that putting direct purchasers in a "preferred position" promotes "vigorous private enforcement of the antitrust laws" because "direct purchasers are not only spared the burden of litigating the intricacies of pass-on but also are permitted to recover the full amount of the overcharge." *Id.* at 745–46. Thus, by "incorporating principles of proximate cause into [the Clayton Act]," and ruling "that *indirect* purchasers who are two or more steps removed from the violator in a distribution chain may not sue ... *Illinois Brick* established a bright-line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers" in antitrust suits. *Apple*, 587 U.S. at 279.

## II. The Defendants' Reason for Grafting the Antitrust Indirect Purchaser Rule onto RICO Does Not Hold Water; the Supreme Court Has Repeatedly Resisted Applying Atextual Antitrust Rules to RICO

Defendants' sole justification for grafting the judge-created and atextual IPR onto RICO is that both the Clayton Act and RICO use the same "by reason of" language in

defining statutory standing. MSJ Mot. at 5:25–27. RICO states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue," 18 U.S.C. § 1964(c), and the Clayton Act states, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue[.]" 15 U.S.C. § 15. According to Defendants, because the Clayton Act has the IPR, the "same language therefore carries the same meaning in RICO, because courts must 'assume [Congress] intended [the language in RICO] to have the same meaning that courts had already given them' in the antitrust context." MSJ Mot. at 6:4–7 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). This argument is often called the "old soil" principle. *See Sekhar v. United States*, 570 U.S. 729, 733 (2013) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947)). "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached[.]" *Morissette v. United States*, 342 U.S. 246, 263 (1952).

There is, however, a problem with Defendants' old soil argument. *Illinois Brick* was decided in 1977, seven years *after* RICO was passed by Congress, and nine years after the RICO statute was first introduced. There is no possible way Congress "intended the language in RICO" to incorporate the IPR when it enacted RICO because the rule did not yet exist. The old soil argument only applies "to the extent that a common-law term has 'accumulated [a] settled meaning.'" *Kousisis v. United States*, 605 U.S. 114, 124 (2025) (quoting *Neder v. United States*, 527 U.S. 1, 21 (1999)). And here, the IPR did not exist, let alone constitute settled common law, when Congress passed RICO.[2]

This point is illustrated in considering how the Supreme Court has applied, or

[2] In fact, the language of 18 U.S.C. § 1964(c), that Defendants claim incorporated the IPR, was proposed in Congress in 1967—before *Hanover* was even decided. *See Sedima,* 473 U.S. at 487 (noting that "[p]revious versions of the legislation … had provided for a private treble-damages action in exactly the terms ultimately adopted in § 1964(c)" starting in 1967).

refused to apply, antitrust law to RICO. In *Holmes*, the Court held that RICO's "by reason of" language required not only but-for causation but also proximate causation. 503 U.S. at 268. Relying on old soil doctrine, the Court noted that the "by reason of" language in the Sherman Act had, for decades, "incorporate[d] common-law principles of proximate causation[.]" *Id.* at 267. And, thus, when Congress borrowed that language for the Clayton Act, Congress "presumably carried the intention to adopt" the proximate causation requirement as well. *Id.* at 267–68. Years later, when Congress again borrowed the "by reason of" language for RICO's § 1964(c), the "reasoning applie[d] just as readily[.]" *Id.* at 268.

However, *Holmes* does *not* stand for the proposition that any judicial gloss on the Clayton Act imputes to RICO—far from it. *Holmes* did not impute proximate causation into RICO because of the Clayton Act, specifically, but because the "by reason of" language had been interpreted, for decades, to include a proximate causation requirement in multiple federal statutes. The *Holmes* Court, however, drew clear lines between the artifacts of antitrust law and RICO, noting that "'antitrust injury' has *no analogue* in the RICO setting." *Id.* at 270 n.15 (emphasis added, citations omitted). And, in the context of interpreting proximate causation for RICO, *Holmes* was clear that in borrowing a directness test from antitrust law, "[w]e do not necessarily use it in the same sense as courts before us have and intimate no opinion on results they reached." *Id.* at 274 n.20; *e.g.*, *J & M Turner, Inc. v. Applied Bolting Tech. Prods., Inc.*, No. CIV. A. 95-2179, 1997 WL 83766, at *10 (E.D. Pa. Feb. 19, 1997) (rejecting "blind" application of the IPR to RICO claims "particularly in view of the Supreme Court's admonition that the 'infinite variety of claims' defies resolution by a single black-letter rule." (quoting *Holmes*, 503 U.S. at 272 n. 20)).

Indeed, the Supreme Court repeatedly resists efforts to apply antitrust legal artifacts to RICO. In *Sedima*, the Second Circuit dismissed a RICO case by "[a]nalogizing to the Clayton Act, which had been the model for § 1964(c)," to conclude "that just as an antitrust plaintiff must allege an 'antitrust injury,' so a RICO

plaintiff must allege a 'racketeering injury'—an injury 'different in kind from that occurring as a result of the predicate acts themselves, or not simply caused by the predicate acts, but also caused by an activity which RICO was designed to deter.'" 473 U.S. at 484–85. The Supreme Court reversed, refusing to "set[] strict requirements on questions such as 'standing to sue'" that were "appropriate in a purely antitrust context." *Id.* at 485, 498–99. The Court found "no room in [RICO's] statutory language for an additional, amorphous . . . standing requirement," *id.* at 495, 500, particularly given Congress's "express admonition that RICO is to be 'liberally construed to effectuate its remedial purposes,'" *id.* at 498.

In *RJR Nabisco v. Eur. Cmty.*, the Supreme Court expressly refused to incorporate the ability to sue for extraterritorial injuries under the Clayton Act into RICO. 579 U.S. 325, 352 (2016) ("There is good reason not to interpret § 1964(c) to cover foreign injuries just because the Clayton Act does so. … we decline to extend this aspect of our Clayton Act jurisprudence to RICO's cause of action."). The Court explained: "Although we have often looked to the Clayton Act for guidance in construing § 1964(c), we have not treated the two statutes as interchangeable. We have declined to transplant features of the Clayton Act's cause of action into the RICO context where doing so would be inappropriate." *Id.* at 352.

And, this year, the Supreme Court, once again, refused to apply antitrust jurisprudence to RICO claims. *Horn*, 604 U.S. at 606–08. The question in *Horn* was whether RICO's civil enforcement provision—the clause "[a]ny person injured in his business or property"—"denies a remedy for business and property loss that derives from a personal injury." *Id.* at 936. The Court expressly rejected the analogy to "antitrust precedent" that had fashioned such a limitation in the Clayton Act. *Id.* at 942. "[R]eliance on antitrust law is misplaced" in a RICO analysis, the Court held, particularly given the dissimilarities in the types of conduct and injury the laws seek to regulate. *Id.* at 942 & n.6. The Court reaffirmed that RICO's "remedial provision" has no room for "atextual hurdles," *id.* at 946 (Jackson, J., concurring), developed in

"modern antitrust precedent," *id.* at 942. Despite similarities in their enforcement schemes, the "Clayton Act and [RICO] are not 'interchangeable.'" *Id.* at 943.

That the Supreme Court has been hesitant to sweep antitrust law, wholesale, into RICO is not surprising. The Clayton Act and RICO address, fundamentally, different types of conduct. The Clayton Act was designed to address monopolistic practices that restrain trade and harm competition. *Allen Bradley Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers*, 325 U.S. 797, 803 (1945) (citing S. Rep. No. 698 (1914)). In nearly every Clayton Act case, the antitrust conduct imposes supercompetitive *pricing* on a purchaser. Thus, cases brought under the Clayton Act will invariably manifest in injury to an immediate "purchaser" who paid inflated prices and thus has standing to sue. This is, indeed, the premise of the IPR. *See Apple*, 587 U.S. at 279. RICO, on the other hand, is a far broader statute created to combat "fraud," "corruption," and "other forms of social exploitation" infiltrating "legitimate business[s]." Organized Crime Control Act, Pub. L. No. 91-452, § 1 (1970). It embraces a wide variety of misconduct, much of which has nothing to do with purchases or supercompetitive pricing. 18 U.S.C. § 1961(1) (listing more than 50 predicate offenses). RICO, unlike the focused nature of antitrust law, is simply not conducive to bright-line rules. *E.g.*, *Bridge*, 553 U.S. at 659 ("A contrary holding would ignore *Holmes*' instruction that proximate cause is generally not amenable to bright-line rules."). "RICO covers a wide range of predicate acts and is notoriously 'expansive' in scope," so "[w]hile a bright-line rule would no doubt be easier to apply, fealty to the statute's focus requires a more nuanced approach." *Yegiazaryan*, 599 U.S. at 545.

Defendants' Motion does not provide much reasoning as to why the IPR should apply to RICO claims; electing, instead, to presume its application because of how the Supreme Court incorporated proximate cause "old soil" into RICO in *Holmes*. MSJ Mot. at 5–6. However, as explained above, the IPR was not old soil when RICO came into existence. So, the reasoning in *Holmes*, does *not* apply to the IPR. Instead, decades of Supreme Court precedent confirm that, due to the ways in which RICO can

apply to different types of racketeering conduct, bright-line rules make little sense, and previous efforts to adopt such rules from antitrust jurisprudence were rejected.

## III. The Indirect Purchaser Rule, to the Extent It Could Be Construed to Apply to RICO, Is Subsumed by the Ninth Circuit's RICO Statutory Standing Test

With Defendants' "old soil" justification for applying the IPR to RICO claims uprooted, the Court is left with threshold questions unanswered by Defendants' Motion. Should the IPR be applied to RICO claims? And, if so, how should it be applied? These issues are on an interlocutory appeal before the Ninth Circuit and are (at the time of this filing), being considered for oral argument in February 2026.[3] *See generally Biederman v. FCA US, LLC*, 25-3854 (9th Cir.). If the Ninth Circuit rules that the IPR does not apply to RICO, it will be dispositive of Defendants' Motion. If the Ninth Circuit rules that the IPR does apply to RICO, then exactly *how* it applies—for example, if the Ninth Circuit holds that the IPR is addressed through its RICO standing jurisprudence—will be relevant and likely need further briefing. Either way, waiting for the Ninth Circuit to rule on this issue seems prudent.[4] That said, if the Court decides this issue now, it should apply the IPR to Plaintiffs' RICO claims using the Ninth Circuit's RICO standing test, as the Ninth Circuit instructs.

As a threshold matter, in determining whether the Court should impose an atextual rule to a federal statute, the analysis must "start with the statute." *Kousisis*, 605 U.S. at 123; *see H.J. Inc. v. Nw Bell Tel. Co.*, 492 U.S. 229, 237 (1989) ("We begin, of course, with RICO's text[.]"). RICO grants a private right of action to "*any person* injured in his business or property by reason of" racketeering activity. 18 U.S.C. § 1964(c) (emphasis added). The phrase "any person" is exceptionally broad and "has no purchaser/seller requirement." *Holmes*, 503 U.S. at 278 (O'Connor, J., concurring). This is why "courts are without authority to restrict the application of"

---

[3] Similarly, this issue is also fully briefed before the Second Circuit. *Yousefzadeh v. Johnson & Johnson Consumer, Inc.*, 24-3296 (2d Cir.).

[4] Plaintiffs' counsel proposed as much to Defense Counsel, i.e., that the Parties wait to ague this motion until after the Ninth Circuit rules, but Defense Counsel refused and insisted that the motion proceed.

RICO by adding one. *Id.* at 286 (quoting *United States v. Turkette*, 452 U.S. 576, 587 (1981)). Nothing in RICO, itself, speaks to whether a plaintiff must be a "direct purchaser" in the subset of RICO claims that involve purchases. And, the Supreme Court has made it clear, when interpreting RICO, "we are not at liberty to rewrite RICO to reflect … our views of good policy. We have repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe." *Bridge*, 553 U.S. at 660; *see also id*. at 648 ("If petitioners' proposed requirement of first-party reliance seems to come out of nowhere, there is a reason: Nothing on the face of the relevant statutory provisions imposes such a requirement."). "On the face" of the statute, there is no *textual* basis for imposing the IPR in a RICO claim. And, courts should not start grafting atextual rules onto RICO, a point recently emphasized by Justice Jackson in her concurrence in *Horn*, 604 U.S. at 614 (Jackson, J., concurring) (Because RICO "shall be liberally construed to effectuate its remedial purposes. … attempts to add atextual hurdles to § 1964(c)," should be rejected.).

That said, as discussed above, the IPR's providence has never been the text of the Clayton Act itself—rather, it is a judge-created rule, fashioned from the fact that, in antitrust cases, supercompetitive prices are absorbed (i.e., passed on) by various layers in a marketplace. This does not mean, however, that the same pragmatic concerns animating the IPR would never apply to RICO. Quite the opposite: there are likely instances where the reasoning behind the IPR could apply with equal force in the RICO context. For example, if racketeering drug companies utilized fraud to sell overpriced drugs, and then sold those overpriced drugs to pharmacies that, in turn, "passed on" those overcharges to consumers, many of the issues animating the IPR from the antitrust context might be worth consideration. But, considering the substantially broader scope of RICO, where pricing is not always at issue, unthinking application of IPR to any RICO case involving a purchase belies decades of RICO jurisprudence eschewing inflexible black-letter rules. *Bridge*, 553 U.S. at 654.

Thus, it should come as no surprise that, in the Ninth Circuit, the black-letter IPR is subsumed into a flexible standing test derived from *Holmes*. *Mendoza*, 301 F.3d at 1168–69. Specifically, to have "RICO standing under 18 U.S.C. § 1964(c), a 'plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by reason of' the RICO violation.'" *Painters I*, 943 F.3d at 1248 (quoting *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008)). Defendants concede, as they must, that the IPR, to the extent it applies to RICO, enters the analysis in the second "by reason of" element. *See* MSJ Mot. 5:22–6:9. And, the "by reason of" element of RICO standing is established when there is "both proximate and but-for causation." *Painters I*, 943 F.3d at 1248; *Glob. Master Int'l Grp., Inc. v. Esmond Nat., Inc.*, 76 F.4th 1266, 1274 (9th Cir. 2023) (same).

When the Ninth Circuit was confronted with the application of the IPR to RICO standing, the court subsumed it into the Ninth Circuit's flexible test for proximate causation. *Mendoza*, 301 F.3d at 1168–69. The Ninth Circuit explained that "[i]n a series of cases beginning in the antitrust context and later extended to RICO, the Supreme Court clarified that potential plaintiffs who have suffered 'passed-on' injury—that is, injury derived from a third party's direct injury—lack statutory standing." *Id.* at 1169. (citing *Illinois Brick*, 431 U.S. at 720; *Assoc. Gen'l Contractors v. Calif. State Council of Carpenters,* 459 U.S. 519 (1983); and *Holmes*, 503 U.S. at 268). The Ninth Circuit noted that "*Illinois Brick* held that government consumers could not sue on a theory that high prices were passed on to them as a result of the defendants' illegal price-fixing scheme." *Mendoza*, 301 F.3d at 1169 (citing *Illinois Brick*, 431 U.S. at 736). According to *Mendoza*, "*Holmes* extended the [*Illinois Brick*] requirement to RICO[.]" *Id.* (citing *Holmes*, 503 U.S. at 268). Thus, the Ninth Circuit, in applying *Illinois Brick* to RICO, utilizes a three-factor statutory standing test derived from *Holmes*. *Mendoza*, 301 F.3d at 1169 ("In this circuit, we focus on three nonexhaustive factors in considering causation, that is whether the injury is "too remote" to allow recovery[.]"); *see Holmes*, 503 U.S. at 269 (describing

the same factors); *see Painters I*, 943 F.3d at 1249 (applying *Holmes* factors to this case). Recently the Hon. Maame Ewusi-Mensah Frimpong recognized this point—that the IPR, to the extent it applies to RICO, is subsumed within the *Mendoza*/*Holmes* factors. *MSP Recovery Claims, Series LLC v. Amgen Inc. ("Amgen II")*, No. 2:23-CV-03130-MEMF-PD, 2025 WL 1924057, at *2 (C.D. Cal. June 24, 2025) ("The Court properly recognized that these [*Mendoza*/*Holmes*] factors govern the Court's IPR analysis."). Other circuits have also held that RICO standing, in the context of the IPR, is governed by *Holmes*. *E.g.*, *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 613–14 (6th Cir. 2004) (holding that the IPR was incorporated by the *Holmes* factors in assessing RICO statutory standing). So have other district courts. *E.g.*, *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1324 (D. Kan. 2018) (rejecting rigid application of the IPR to RICO claims and focusing on *Holmes* factors for proximate causation); *GolTV, Inc. v. Fox Sports Latin Am., Ltd.*, No. 16-24431-CIV, 2018 WL 1393790, at *19 (S.D. Fla. Jan. 26, 2018) (same); *J & M Turner,* 1997 WL 83766, at *9–12 (same).

The reasoning that drove the creation of the IPR in *Hanover* and *Illinois Brick* closely tracks the *Mendoza*/*Holmes* factors. In *Hanover*, the Court held that the first purchaser of an overpriced product is, itself, harmed, regardless of any pass on, and thus, is in the best position to vindicate antitrust harm. *Hanover*, 392 U.S. at 489–94. This is the first consideration under the *Mendoza*/*Holmes* test: "whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general[]." *Mendoza*, 301 F.3d at 1169. In *Illinois Brick*, the Court discussed the difficulties in estimating damages for indirect purchasers, even "under an array of simplifying assumptions" due to the nature of economic theory and the way supercompetitive prices are passed on to customers. 431 U.S. at 742. This is the second *Mendoza*/*Holmes* factor: "whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct[.]" *Mendoza*, 301 F.3d at 1169. In *Illinois Brick*, the Court expressed concern that

allowing indirect purchaser antirust claims would create "massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge[.]" 431 U.S. at 737. This is the third *Mendoza/Holmes* factor: "whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." *Mendoza*, 301 F.3d at 1169. In other words, the very concerns animating the IPR are already built into the Ninth Circuit's test for examining statutory standing under RICO. And, the Ninth Circuit's decision to subsume the IPR's considerations into its RICO's statutory standing test is consistent with the Court's directive in *Holmes*—that "the infinite variety of claims that may arise [under RICO] make it virtually impossible to announce a black-letter rule that will dictate the result in every case" for determining whether an alleged RICO violation was the cause of a plaintiff's injuries. 503 U.S. at 272 n. 20.

## IV. Pursuant to the Ninth Circuit's RICO Standing Test, the Ninth Circuit Has Already Held that Plaintiffs Have RICO Standing, and that Plaintiffs Were Directly Injured by Defendants' RICO Conduct

Because the IPR is subsumed by the Ninth Circuit's RICO standing test, this Court need not spend much ink denying Defendants' motion here. This Court and the Ninth Circuit have already done the work. The Ninth Circuit previously applied the *Holmes* factors to the claims of *this case* and held that statutory standing, including proximate causation, was satisfied. *Painters I*, 943 F.3d at 1251 ("The *Holmes* factors also weigh in favor of permitting Plaintiffs' RICO claims to proceed."). Regarding whether there are more direct victims of Takeda and Lilly's RICO violations (the first *Mendoza/Holmes* factor), the Ninth Circuit held that "[h]ere, patients and TPPs who paid money for Actos ***are the most direct victims of those who suffered economic injury***." *Id.* at 1252 (emphasis added). Indeed, the Ninth Circuit could not identify any other entity that suffered *economic* harm, let alone more direct harm. *Id.*

Regarding whether damages were calculable (second *Mendoza/Holmes* factor), the Ninth Circuit deferred to the trial court to let Plaintiffs prove their claim. *Id.* at 1251. And, on remand, after admitting Plaintiffs' economic damages expert, this

Court held, affirmed by the Ninth Circuit, that "damages can be calculated formulaically in a manner consistent with Plaintiffs' theory of liability.]" *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd. ("Painters III"),* 674 F. Supp. 3d 799, 827 (C.D. Cal. 2023), *aff'd,* No. 23-55742, 2025 WL 1683472 (9th Cir. June 16, 2025). Thus, on this record, there is no question that damages can be estimated and attributable to the alleged wrongful conduct.

Regarding whether complex methods will be needed to apportion damages and avoid multiple recoveries (the third *Mendoza/Holmes* factor), the Ninth Circuit held there was no risk of duplicative recoveries here:

> There is no concern of "duplicative recoveries by plaintiffs removed at different levels of injury from the violation." *Bridge*, 553 U.S. at 658. It is each individual plaintiff who paid out money for Actos prescriptions who now seeks recovery of those payments. … the damages suffered by Patients and Painters Fund do not overlap, as it appears that Patients seek to recover only the dollars they paid for Actos out-of-pocket, for which they have not been reimbursed by a TPP.

*Painters I*, 943 F.3d at 1251–52. Thus, all the *Mendoza/Holmes* factors are met, pursuant to the law of the case, and Plaintiffs have statutory standing to bring RICO claims. Defendants' challenge to Plaintiffs' RICO standing by invoking the IPR fails.

Indeed, applying the IPR to bar Plaintiffs' claims does not make sense. This case does not involve pass on injury because any entity involved in the distribution of Actos prior to Plaintiffs' filling of a prescription has no injury to pass. In a pricing context, the injury of paying supercompetitive prices is born by the first purchaser, regardless of whether those overcharges are passed on to customers. *Hanover*, 392 U.S. at 489. That first purchaser must decide how it will absorb or pass on the supercompetitive price in reselling the product. That the first purchaser suffers a direct antitrust injury is the intellectual backbone of the IPR. *Id.* And, in a RICO case, if the racketeering activity causes greater prices to be paid for a product, the IPR may well serve to limit RICO standing to the first person to bear the supercompetitive price, pursuant to the *Mendoza/Holmes* factors and the IPR.

However, here, under a quantity-effect RICO theory, *see Painters I*, 943 F.3d at

1247, the entities in the supply chain were never injured; in fact, they *benefited* from the racketeering. They are distributors facilitating the movement of goods. They did not "purchase" Actos "by reason of" the Defendants' racketeering because they stocked Actos like they would have regardless of the concealed bladder cancer risk. They simply distributed Actos in response to decisions *by patients* to fill prescriptions. Any distributor in the supply chain was, thus, *by definition*, able to *sell greater amounts* of Actos "by reason of" the Defendants' racketeering. *Cf. Humana, Inc. v. Biogen, Inc.*, 666 F. Supp. 3d 135, 154 (D. Mass. 2023), *reconsideration denied,* No. CV 21-11578-FDS, 2023 WL 8374584 (D. Mass. Dec. 4, 2023), *aff'd on other grounds,* 126 F.4th 94 (1st Cir. 2025) ("The wholesaler is selling a higher quantity of the expensive drugs, probably at a higher margin than the cheaper alternatives, and likely has suffered no injury."). This stands in stark contrast to the first purchaser in an overcharge case, who bears the supercompetitive pricing in the first instance, "by reason of" the wrongdoing, regardless of whether they pass that overcharge on to customers. Put simply, any distributors, here, do not "pass on" any RICO injury to TPPs or consumers because they did not suffer any RICO injury; they actually benefited from the RICO violations.

And, this makes sense. In a pricing context, the anticompetitive or RICO conduct is directed at the entire market and, thus, the injury occurs at the point of first entering that market, i.e., first purchase. Here, however, the fraudulent RICO conduct was directed at consumers and their prescribing physicians, so it is not until a consumer acts, i.e., fills a prescription for Actos, that the RICO injury manifests, and money is paid that would otherwise never have been paid. As the Supreme Court has repeatedly held, in assessing RICO causation, the issue is not privity of the underlying transaction, but the *direct relationship* between the RICO *conduct* and the *economic injury*. *Horn*, 604 U.S. at 612 ("Time and again, we have reiterated that § 1964(c)'s 'by reason of ' language demands 'some direct relation between the injury asserted and the injurious conduct alleged.'" (quoting *Holmes*, 503 U.S. at 268)); *Bridge*, 553 U.S.

at 647 ("RICO provides a private right of action … to *any person* injured in his business or property by reason of the *conduct* of" of racketeering (emphasis added)).

None of the concerns that give rise to the IPR exist here. For one, there is no risk of duplicative recoveries. *Illinois Brick*, 431 U.S. at 730–31. "Here, like in *Bridge* … there is no concern of 'duplicative recoveries by plaintiffs removed at different levels of injury from the violation.'" *Painters I*, 943 F.3d at 1251. The *only* prescriptions at issue are the ones that were, in fact, purchased by consumers and TPPs. *Id.* Thus, by operation of logic, the "purchases" at issue caused no economic harm to any entity in the distribution chain. Only the "patients and TPPs who paid money for Actos are the most direct victims of those who suffered economic injury." *Id.* at 1252. Similarly, this case does not "transform ... into [a] massive multiparty litigation[] involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Illinois Brick*, 431 U.S. at 470. None of the distributors in this case have a RICO claim. And, using the IPR to prevent the only injured parties, i.e., Plaintiffs, to proceed with a claim, would not promote the policy that animated the IPR: to promote the "vigorous private enforcement of" federal law. *Id.* at 745–46. As the Ninth Circuit held here, "holding Defendants liable for Plaintiffs' alleged injuries advances the interest in deterring injurious conduct, without including others who did not suffer direct out-of-pocket losses." *Painters I*, 943 F.3d at 1252.

Defendants attempt to side-step the Ninth Circuit's ruling in this case by arguing that the IPR "is 'an analytically distinct' analysis from RICO's proximate cause requirement." MSJ Mot. at 3:27–4:7. Defendants do not really explain this argument; instead, Defendants cite non-binding out-of-circuit-cases and just assert that the Ninth Circuit's ruling on proximate causation, "does not address the separate question of whether Plaintiffs' claims are barred by the" IPR. *Id.* at 4:7–14. But, this is not correct. In *Apple*, the majority and dissent both acknowledged that the IPR was *based on proximate causation*. 587 U.S. at 279 ("[I]ncorporating principles of proximate cause into [Clayton Act], we have ruled that indirect purchasers who are

two or more steps removed from the violator in a distribution chain may not sue."); *id.* at 1525–26 ("*Illinois Brick* held that these convoluted 'pass on' theories of damages violate traditional principles of proximate causation …" (Gorsuch, J., dissenting)). Claiming that the IPR and proximate cause are "analytically distinct" blinks reality. While it is true that the Ninth Circuit's ruling in this case did not directly address the IPR, the Ninth Circuit has squarely stated the factors governing RICO standing, which, as explained in *Mendoza*, subsume the IPR. 301 F.3d at 1169.

To the extent Defendants argue in their Reply that the IPR imposes a separate standing requirement, untethered to *Holmes* or considerations of proximate causation, such an argument is unavailing. The RICO statute, itself, is clear that "any person" may bring a RICO claim provided they were injured "by reason of" the RICO conduct. 18 U.S.C. § 1964(c). This language "has no purchaser/seller requirement[.]" *Holmes*, 503 U.S. at 278 (O'Connor, J., concurring). And, the "by reason of" is satisfied by establishing proximate and but-for causation. *Painters I*, 943 F.3d at 1248. So, the only way to fashion a new and completely atextual standing requirement for RICO—one that, as Defendants may argue, is entirely distinct from proximate causation—would be for the Court to create such a rule. But, the IPR does not fit that bill—it is predicated on an application of proximate causation to antitrust economic realities. *See* Apple, 587 U.S. at 279. To apply the IPR to RICO, the Court would need to invoke those same principles the Supreme Court did in creating it, i.e., proximate causation; and, were it to do so, the Court would run headlong into *Mendoza* and *Holmes*, which already spell out that test. All roads lead to *Holmes*. And, as explained above, the Ninth Circuit holds that Plaintiffs satisfy *Holmes* and have RICO standing.

## V. Blind Application of the Indirect Purchaser Rule, Untethered to RICO Standing or Proximate Causation, Makes No Sense and Defies Supreme Court Precedent

To be clear—Plaintiffs are *not* taking the position that the IPR never applies to RICO. Bright-line rules are *not* the appropriate way to interpret RICO, even if they aid Plaintiffs. Rather, Plaintiffs' position is that the IPR is subsumed by the

*Mendoza*/*Holmes* factors in assessing RICO standing because those factors squarely address the concerns that animated the IPR. In other words, the Court should consider the IPR using "sensible" principles. *Cf. Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 605 n.6 (6th Cir. 2024) ("A bright-line indirect-purchaser rule is, accordingly, unsupported by sensible principles."). Defendants' citations to courts applying the IPR to RICO claims are, therefore, in large part, inapposite—Plaintiffs do not disagree that the IPR *can* apply to RICO in certain circumstances. Some of those cases have nothing to do with a RICO claim involving a purchase.[5] Some involve RICO claims related to elevated prices—antitrust analogues that do not really address the logic of applying the IPR to quantity-effect cases.[6] Missing from the Defendants' brief are citations to the cases where courts refused to bar RICO claims pursuant to the IPR.

In *MSP Recovery Claims, Series LLC v. Amgen Inc. ("Amgen I")*, TPPs brought RICO claims against the manufacturers of drugs used to treat hyperparathyroidism and multiple myeloma, alleging that the companies illegally funneled funds to subsidize patient co-pays, increasing the quantity dispensed and the price paid. No. 2:23-CV-03130-MEMF-PD, 2024 WL 3464410, at *1–2 (C.D. Cal. July 15, 2024), *motion to certify appeal denied*, No. 2:23-CV-03130-MEMF-PD, 2025 WL 1924057 (C.D. Cal. June 24, 2025). Defendants, like here, moved to bar the Plaintiffs' claims

---

[5] *See Carter v. Berger*, 777 F.2d 1173, 1174 (7th Cir. 1985) (defendants illegally obtained tax breaks causing lawful tax payers to pay more); *Trollinger*, 370 F.3d at 613–17 (applying *Holmes* factors to determine whether Tyson's union employees were the best "directly injured party" to sue for Tyson's practice of hiring undocumented immigrants); *Newton v. Tyson Foods, Inc.*, 207 F.3d 444 (8th Cir. 2000) (alleged RICO conduct allowed poultry farmers to sell more chicken, causing injury to cattle farmers); *Sperber v. Boesky*, 849 F.2d 60, 65 (2d Cir. 1988) (stock holders injured when the market price of six stocks dropped following the announcement that an executive had been involved in widespread insider trading and other illegality).

[6] *See, e.g.*, *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 845–47, 855 (3d Cir. 1996) (clients suing hospitals for overcharging their lawyers for purchasing medical records, where plaintiffs did not challenge application of IPR to their RICO claims); *Humana, Inc. v. Indivior Inc.*, No. CV 20-4602, 2021 WL 3101593, at *1 (E.D. Pa. July 22, 2021), *aff'd on different grounds*, No. 21-2573, 2022 WL 17718342 (3d Cir. Dec. 15, 2022) (alleging defendant fraudulently introduced new product to keep its Suboxone drug prices artificially high and impede generic manufacturers from competing); *In re Insulin Pricing Litig.*, No. 3:17-CV-0699-BRM-LHG, 2019 WL 643709, at *1 (D.N.J. Feb. 15, 2019) (alleging RICO conduct allowed Defendants to sell insulin products at elevated prices); *Harris Cnty., Texas v. Eli Lilly & Co.*, No. CV H-19-4994, 2020 WL 5803483, at *2 (S.D. Tex. Sept. 29, 2020) (same).

pursuant to the IPR. *Id.* at *9. Citing *Mendoza*, *Holmes*, and *Painters I*, Judge Frimpong considered the IPR challenge within the *Mendoza*/*Holmes* framework, explaining that "[b]ecause the IPR inquiry and the cause inquiry are related, the Court analyzes them both together." *Id.* at *9–10 n.9. The court began by noting that "[t]he health care context is unique," because "although insurers do not decide what medications their beneficiaries will take, insurers do pay for a portion of the medication cost and can thus be considered a 'purchaser' in part (and as such, the IPR would not bar claims from insurers)." *Id.* Because the "purchaser" has been "separated into three different entities—the patient, the government, and the insurers," the court did not "find that the traditional application of the IPR fits the present situation." *Id.* Turning to the "three factors outlined in *Mendoza*," the court found they weighed in favor of RICO standing, because there were no "more direct victims of the wrongful conduct" than the plaintiffs. *Id.* Further, the court held that it would not be difficult "to ascertain the amount of the assignors' damages, as their overpayment is separate and apart from overpayment by another 'purchaser[.]'" *Id.* And, "[a]s such, the Court will not have to adopt complicated rules apportioning damages." *Id.* Ultimately, Judge Frimpong, following Ninth Circuit precedent, considered defendants' IPR challenge through the lens of *Mendoza*/*Holmes*. *Id.*; *see Amgen II*, 2025 WL 1924057, at *2 (in denying reconsideration, Judge Frimpong stressed that the *Mendoza*/*Holmes* "factors govern the Court's IPR analysis.").

Other courts agree that interpreting the IPR in the context of RICO should focus on the standing factors enumerated by *Holmes*, not some atextual "rule" born from the idiosyncratic realities of antitrust economics. *E.g.*, *In re: EpiPen*, 336 F. Supp. 3d at 1325 (refusing to bar plaintiffs' RICO claims under a rigid application of the IPR because the plaintiffs plausibility alleged proximate causation pursuant to Holmes and, thus, had RICO standing); *GolTV*, 2018 WL 1393790, at *19 ("[T]he Eleventh Circuit has found the standard for RICO standing is a determination of proximate cause" and "[h]ere, the pleading alleges proximate cause, and as such, is sufficient to establish

GolTV's RICO standing."); *MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*, No. 21-21317-CIV, 2022 WL 3155035, at *12 n. 3 (S.D. Fla. July 21, 2022), *report and recommendation adopted*, No. 1:21-CV-21317, 2022 WL 4448256 (S.D. Fla. Sept. 23, 2022) (dismissing claims based on proximate causation analysis, but rejecting IPR arguments because they were "not … persuasive …. Although RICO jurisprudence prioritizes directness … that does not mean every RICO case should follow a 'bright-line' rule precluding indirect purchasers from suing antitrust violators."); *J & M Turner*, 1997 WL 83766, at *9–12 (refusing to "blindly" "follow the IPR, "particularly in view of the Supreme Court's admonition" in *Holmes* that "the 'infinite variety of claims' defies resolution by a single black-letter rule" and, instead, applying *Holmes* proximate causation test to determine "whether Turner has alleged a sufficiently direct injury to confer RICO standing.").

Tellingly, in several cases that use the IPR to bar a plaintiffs' quantity-effect RICO claim, courts either refuse to think too hard about the question or, when they do, find the IPR irrational. For example, in *In re Zantac*, the plaintiffs argued that they "suffered the first—and perhaps only—injury by purchasing a drug with a material, undisclosed safety risk" and, thus, were "not indirect purchasers as understood by *Illinois Brick* because they are the direct victims and targets of Defendants' fraud and any intermediaries purely benefitted from the increased demand[.]" *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 546 F. Supp. 3d 1216, 1226 (S.D. Fl. 2021) (internal quotations omitted). The court, however, refused to engage the argument. Citing antitrust case, court closed its eyes: "the bright-line rule of *Illinois Brick* means that there is no reason to ask whether the rationales of *Illinois Brick* 'apply with equal force' in every individual case" and "[b]ecause the rationales underpinning the indirect purchaser rule are not dispositive, the Court need not discuss them here in order to apply the indirect purchaser rule to Plaintiffs' RICO claim." *Id.* (quoting, in part, *Apple*, 587 U.S. at 285). Because antitrust applies IPR in a rigid manner, it must be applied, rigidly, to RICO—no questions asked.

In *Humana, Inc. v. Biogen, Inc.*, a Massachusetts district court appeared ready to engage the logic of the IPR rule directly, specifically in a pharmaceutical quantity-effect theory, but then punted. 666 F. Supp. 3d at 152–54. The *Biogen* court noted that "[i]t is certainly true that the concept of a 'purchaser' does not transfer neatly from the antitrust context to the health-care context. Antitrust cases typically involve a marketplace scenario with multiple levels, with payment for and title to goods passing from one participant to another at each level[.]" *Id.* at 152. However, "[i]n the prescription-drug marketplace, those purchasing functions are normally split three ways: the physician effectively makes the decision to buy the product; the health insurer effectively pays for it (although the patient is required to make a copay); and the patient owns and uses it." *Id.* "For that reason, in the prescription-drug marketplace, a scheme to defraud often targets the government or third-party payors—the entities that actually pay for the drugs at issue." *Id.* at 153. Thus, "[t]he theory of the injury here … does not neatly align with a normal antitrust marketplace scenario, in which the monopolist sets an artificially high price. Instead, the core allegation appears to be that the medication was over-prescribed." *Id.*

> To the extent [] that the theory of injury is that the scheme caused the writing of a greater number of expensive prescriptions, the wholesaler (the direct purchaser) may have no incentive to file suit against the drug manufacturer. The wholesaler is selling a higher quantity of the expensive drugs, probably at a higher margin than the cheaper alternatives, and likely has suffered no injury. Instead, it is the payors—the health insurer and the patients—who are the injured parties. And because the scheme here compensated the patients by making their copayment, the insurer may be the only injured party.

*Id.* at 154. The *Biogen* court, thus, outlined the fundamental incoherence of trying to graft a rigid IPR onto quantity-effect RICO claims. *Id.* at 152–54. But then, having set the table, the *Biogen* court punted: "while there may be reasons to carve out an exception to the indirect purchaser rule, or to conclude that it should not apply, such a decision is fraught with policy judgments that are more properly committed to the Court of Appeals rather than a single District Judge." *Id.*

The *Biogen* court, however, was tame compared to the Sixth Circuit in *Fenner*,

113 F.4th at 605 n.6. There, the Sixth Circuit, feeling compelled to apply the IPR because of the language in *Trollinger*—language that, ironically, holds that the IPR is addressed in RICO using the *Holmes* factors—made the same we-have-no-right-to-question-anything argument that the *Zantac* court made. *Id.* at 604. However, unlike the *Zantac* court, the Sixth Circuit acknowledged the truth of things in a footnote:

> ***We would be remiss not to note the consequences of such a bright-line rule that mixes law and economics but does not necessarily reflect economic reality today.*** Under this rule, major manufacturers can insulate themselves from all antitrust and RICO liability, simply by selling their products through intermediaries. Because the business and success of intermediary car dealerships is dependent on car manufacturers, for example, consumers cannot rely on the intermediary car dealerships to vindicate their interests. As this case illustrates, car dealerships are not suing car manufacturers for RICO violations; doing so is against the intermediary's interest. As a result, average car consumers have no recourse and major manufacturers are insulated from any liability. ***At bottom, rules must be supported by sensible principles.*** In a world with interdependent vertical economic structures, a bright-line indirect-purchaser rule does not facilitate effective enforcement of RICO and antitrust laws nor eliminate duplicative damages—***this rule, instead, immunizes major manufacturers from any RICO or antitrust liability and hurts consumers***. … ***A bright-line indirect-purchaser rule is, accordingly, unsupported by sensible principles.***

*Id.* at 605 n.6 (emphasis added); *see also MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 110 n. 11 (4th Cir. 2025) (noting diverging opinions about the rigid application of the IPR to RICO).

That the above courts, applying the IPR to RICO quantity-effect cases, can only justify it with non-sensible principles—if they even deign to engage the reasoning of the IPR at all—speaks volumes of the wisdom of the Ninth Circuit's holding in *Mendoza*. RICO is not suited to bright-line / black-letter rules. *Bridge*, 553 U.S. at 660. To the extent the Court considers the IPR under the facts of this case, then it should consider it through the lens of RICO standing and the *Mendoza*/*Holmes* factors. And, considering the Ninth Circuit already conducted that analysis in this case, *six years ago*, there is no need to relitigate this issue, yet again. Plaintiffs were the most directly injured by the Defendants' fraudulent concealment of the risk of bladder cancer in Actos because they, and only they, sustained economic harm by reason of

Defendants' racketeering activity. As such, under *Mendoza*/*Holmes*, Plaintiffs have standing and the IPR does not bar Plaintiffs' RICO claims.

This result is the only logical reading of the Supreme Court's ruling in *Bridge*. In *Bridge*, bidders at a county tax lien auction alleged they were harmed by defendants' fraudulent scheme to purchase more bids at the auction. 553 U.S. at 642–43. The scheme involved making false affidavits to the county. *Id.* By inflating the number of competing bids, the plaintiffs were denied the ability to purchase liens from the county. *Id.* The defendants argued that plaintiffs could not establish causation because the misrepresentations were directed at the county, not the plaintiffs, so any injury caused to plaintiffs lacked standing. *Id.* at 653. A unanimous Court rejected this argument, holding that the "alleged injury—the loss of valuable liens—[was] the direct result of petitioners' fraud." *Id.* at 658. It did not matter that the defendants' fraudulent lien purchases were directly with the county. The Supreme Court did not require privity between the parties for plaintiff to have RICO standing. Instead, the Supreme Court was clear that the competing bidders, who held no privity with the defendants, were the directly injured party and had standing to bring RICO claims, even though the purchases at issue were not between the plaintiffs and defendants.

*Bridge* not only illustrates that the IPR, to extent it applies to RICO, must make sense based on the facts of the case, but that bright-line rules do not and cannot be blindly applied to RICO claims. This Court must reject Defendants' invitation to do just that—the IPR, as applied to this case, does not make sense. It should not be used to exonerate Takeda's and Lilly's criminal conduct here.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion.

Dated: November 12, 2025 **WISNER BAUM, LLP**

*/s/ R. Brent Wisner*
R. Brent Wisner (SBN: 276023)

rbwisner@baumhedlundlaw.com
Michael L. Baum, Esq. (SBN: 119511)
mbaum@baumhedlundlaw.com
Harrison E. James, Esq. (SBN: 337733)
hjames@wisnerbaum.com
10940 Wilshire Blvd, 17th floor
Los Angeles, CA 90024
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

Christopher L. Coffin (*pro hac vice*)
ccoffin@pbclawfirm.com
**PENDLEY, BAUDIN & COFFIN, LLP**
1100 Poydras Street, Suite 2505
New Orleans, LA 70163
Telephone: (504) 355-0086
Facsimile: (504) 355-0089

## CERTIFICATE OF SERVICE

I, R. Brent Wisner, hereby certify that, on November 12, 2025, I electronically filed the foregoing with the Clerk for the United States District Court for the Central District of California using the CM/ECF system, which shall send electronic notification to counsel of record.

*/s/ R. Brent Wisner*
R. Brent Wisner